BRADLEY S. SCHRAGER, ESQ. (SBN 10217)
DANIEL BRAVO, ESQ. (SBN 13078)
BRAVO SCHRAGER LLP
6675 South Tenaya Way, Suite 200
Las Vegas, Nevada 89113
Tele.: (702) 996-1724
Email: bradley@bravoschrager.com
Email: daniel@bravoschrager.com

HANNAH SWANSON, ESQ. *(admitted pro hac vice)*
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave NW, Suite 300
Washington, DC 20005
Email: hannah.swanson@ppfa.org

VALENTINA De FEX, ESQ. *(admitted pro hac vice)*
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street, Floor 9
New York, NY 10038
Email: valentina.defex@ppfa.org
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Planned Parenthood Mar Monte, | Case No.: 3:85-cv-00331-ART-CSD |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MOTION FOR STAY OF DISTRICT COURT DECISION** |
| Aaron Ford, in his capacity as Nevada Attorney General, et al., | |
| Defendants | |

# INTRODUCTION

Plaintiff Planned Parenthood Mar Monte, Inc. ("Planned Parenthood Mar Monte" or "PPMM") on behalf of itself, its patients under the age of eighteen, and its providers, respectfully moves for a stay of the Court's March 31, 2025 Order granting the District Attorney's Federal Rule of Civil Procedure Rule 60(b) motion and ordering vacatur of the 1991 final judgment, Order on Defs.' Mot. for Relief from J. ("Rule 60(b) Order"), ECF No. 135. Absent a stay of the order, Senate Bill 510's ("S.B. 510") parental notification and judicial bypass provisions will take effect on April 30, 2025 for the first time since 1985. Planned Parenthood Mar Monte hereby requests that this Court stay its decision and vacatur order pending the resolution of PPMM's appeal to the Ninth Circuit Court of Appeals, or in the alternative, grant a temporary administrative stay to allow PPMM to seek a stay before the Ninth Circuit.

The four stay factors compel the grant of a stay of this Court's Rule 60(b) Order pending Ninth Circuit review. *See Nken v. Holder v. Holder*, 556 U.S. 418, 434 (2009). Absent a stay, young people and providers in Nevada will face for the first time in almost forty years the enforcement of S.B. 510's requirements.[1] All will be required to comply with vague statutory requirements, some that exist only in the abstract, while risking significant consequences. Should these provisions go into effect throughout the pendency of the appeal to the Ninth Circuit, patients and providers will experience irreparable and substantial harms: unmarried and unemancipated patients under the age of eighteen will face physiological, emotional, social and economic harms caused by unnecessary delays and in some cases, denial of abortion access that they are entitled to under Nevada State Law. Providers and PPMM face a credible threat of criminal and civil penalties, including loss of licensure, as well as other harms. The remaining equitable factors also weigh in favor of granting a stay and preserving the status quo that has existed for four decades. Accordingly, this Court should grant a stay of its decision before the law goes into effect on April

---

[1] PPMM recognizes that the arguments in this motion overlap significantly with the issues addressed in this Court's Rule 60(b) Order. As set forth in this brief, a district court may issue a stay without recognizing that it erred in its underlying decision. Separately, Federal Rule of Appellate Procedure 8 requires that PPMM first move for a stay of this order in the district court.

30, 2025.

## RELEVANT FACTS AND PROCEDURAL HISTORY

### I.    S.B. 510 and the *Glick v. McKay* Proceedings

S.B. 510, passed in 1985, bars a physician from performing an abortion for any "unmarried or unemancipated" patient under the age of eighteen without notifying a "custodial parent or guardian" ("parental notification"), or receiving a court order through a specified process ("judicial bypass") waiving this requirement. *See* NRS 442.255; NRS 442.2555; *see* Rule 60(b) Order 2–5, ECF No. 135 (setting forth S.B. 510's parental notification and judicial bypass provisions). NRS 442.257 sets forth criminal penalties for violating these statutes.

On June 28, 1985, Dr. Eugene Glick and Planned Parenthood of Washoe County filed suit against state and local officials responsible for enforcing the statutes. Compl., ECF No. 1. This Court granted a temporary restraining order that day, *see* TRO, ECF No. 6, and a preliminary injunction on July 17, 1985, *see Glick v. McKay*, 616 F. Supp. 322 (D. Nev. 1985), barring enforcement of the parental notification and judicial bypass provisions.[2] On October 10, 1991, this Court entered declaratory and permanent injunctive relief barring enforcement of the enjoined provisions. Judgment, ECF No. 74; J. in a Civil Case, ECF No. 75. Since their passage in 1985, S.B. 510's parental notification and judicial bypass provisions have never been in effect.

### II.    Rule 60(b) Motion

On December 1, 2023, Movants, Carson City District Attorney and Lyon County District Attorney ("District Attorneys"), filed a Motion under Rule 60(b)(5) seeking to vacate this Court's 1991 final judgment. Mot. of Defs. Jason D. Woodbury, Carson City District Att'y, & Stephen B. Rye, Lyon County District Att'y, for Relief Under Fed. R. Civ. P. 60(b)(5), ECF No. 83. On October 29, 2024, this Court held a hearing on the motion and subsequently ordered supplemental

---

[2] As the parties and this Court are familiar with the lengthy procedural history of this case through briefing of the Rule 60(b) Motion, Plaintiff hereby incorporates the procedural history set forth in its Opposition to Rule 60(b) Motion of Defendants Jason D. Woodbury, Carson City District Attorney, and Stephen B. Rye, Lyon County District Attorney 1–4, ECF No. 115, and in this Court's Rule 60(b) Order 5–7, ECF No. 135. *See also Glick v. McKay*, 937 F.2d 434 (9th Cir. 1991) (Ninth Circuit decision affirming the grant of preliminary injunction).

1   briefing, which was completed on December 20, 2024. *See* Mins. of Proceedings, ECF No. 127;
2   Order on Suppl. Briefing, ECF No. 126.

3           **A. The Rule 60(b) Decision**

4           On March 31, 2025, this Court issued its decision granting the District Attorneys'[3] Rule
5   60(b)(5) Motion, vacating the permanent injunction as of April 30, 2025 and allowing NRS
6   442.255, 442.2555, and 442.257 to go into effect that day. *See* Rule 60(b) Order, ECF No. 135.
7   The Court limited its merits analysis to whether under Fed. R. Civ. P. 60(b)(5)'s "inequity
8   provision," *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) overruled *Glick
9   v. McKay*, 937 F.2d 434 (9th Cir. 1991), requiring the vacatur of this Court's 1991 permanent
10  injunction. The Court's decision did not address the District Attorney's other arguments in support
11  of relief under Fed. R. Civ. P. Rule 60. *See* Rule 60(b)(5) Order 9. In granting the motion, this
12  Court found its filing seventeen months after *Dobbs* was reasonable, *id.* at 14, and that the District
13  Attorneys' arguments related to *Dobbs* should be evaluated under Rule 60(b)(5)'s inequity prong.
14  *See id.* at 16. Next, it determined that Ninth Circuit's decision in *California by and through
15  Becerra v. EPA*, 978 F.3d 708 (9th Cir. 2020), not *America Unites for Kids v. Rousseau*, 985 F.3d
16  1075 (9th Cir. 2021) established the standards governing the merits of the "inequity provision"
17  arguments related to *Dobbs*. Rule 60(b)(5) Order 17–20, 21. Applying *Becerra*, this Court
18  determined that because *Dobbs* overruled *Glick*, requiring compliance with the 1991 permanent
19  injunction would be inequitable. *Id.* at 24. In determining "whether the proposed modification is
20  suitably tailored to the changed circumstances," it determined that *Becerra* controlled the outcome.
21  *Id*. Lastly, the Court decided that whether independent constitutional grounds should be considered
22  in determining whether to lift the injunction was not properly before it, absent Plaintiff's filing of
23  a new motion for a preliminary or permanent injunction. *Id*. at 24–26. On April 11, 2025, PPMM
24  filed an appeal of the Rule 60(b) decision. Notice of Appeal, ECF No. 136.

25  **III.    PPMM's Health Care Services**

26          Plaintiff, Planned Parenthood Mar Monte ("PPMM"), is a non-profit organization formed

27  _____
    [3] No other Defendant joined the District Attorneys' Motion.
28

3

in the 1990s and the successor in interest of Planned Parenthood Washoe County, the original plaintiff in these proceedings[4]. *See* Mot. for Substitution and To Be Designated Successor Pl., ECF No. 103. PPMM operates thirty-five health centers throughout Nevada and California. Ex. A, Dalton Decl. ¶ 9. Presently, PPMM provides a range of reproductive and primary health services in Nevada including contraception, pregnancy planning and testing, medically accurate options counseling, abortion, prenatal and postpartum services, STD/STI testing and treatment, HIV testing, and wellness and preventive care services including cancer prevention and screening for chest/breast, cervical, testicular and prostate cancer. *Id*. PPMM—through its Nevada-licensed physicians—provides procedural and medication abortion at health centers in Reno, NV and North Las Vegas, NV. Dalton Decl. ¶ 10. PPMM's physicians also provide other forms of reproductive and primary health services to individuals in Nevada seeking health care. Dalton Decl. ¶ 10.

## A. Abortion Is a Safe and Common Procedure

Abortion is one of the safest medical treatments in the United States. It is time sensitive and essential health care. In Nevada, abortion is available until the twenty-fourth week of pregnancy. NRS 442.250; Nev. Admin. Code § 442.120. Because this statute was submitted to and approved via referendum at the 1990 general election, NRS 442.250 can be modified only through the referendum process. As such, "any person in Nevada who is pregnant has the legal right to choose to have an abortion when performed by a licensed physician within the first 24 weeks of pregnancy." *See* Ex. B, Abortion Information for Nevadans[5].

For any person that is pregnant, the alternative to abortion is carrying a pregnancy to term and labor and childbirth. Even when considered to be uncomplicated, a pregnancy carries substantial risks and physical and mental burdens. Dalton Decl. ¶¶ 14–21. Pregnancy can also exacerbate numerous pre-existing medical conditions and can result in new and debilitating health

---

[4] Dr. Eugene Glick, the other original Plaintiff in this case, is deceased. *See* Mot. for Substitution and To Be Designated Successor Pl. 2, ECF No. 103.

[5] This information can also be found at Department of Health and Human Services Nevada Division of Public and Behavioral Health, *Abortion Information for Nevadans*, https://dpbh.nv.gov/Programs/MIP/AbortionInNevada/#:~:text=Nevada%20Law%20and%20Ab ortion,first%2024%20weeks%20of%20pregnancy (last visited April 14, 2025).

conditions. Dalton Decl. ¶¶ 14–16. Pregnancy can also induce or exacerbate various mental health conditions. Dalton Decl. ¶ 17. Labor and childbirth also carry risks including a wide array of serious complications that can result in long-term physiological effects, post-partum trauma, and in some cases, death. Dalton Decl. ¶¶ 18-21.

## IV.    S.B. 510's Parental Notification and Judicial Bypass Requirements

Should the enjoined provisions go into effect, Planned Parenthood Mar Monte, its staff, and patients, as well as any other Nevada abortion provider, the court system, the legal profession generally, and any pregnant person under the age of eighteen will be required to comply with NRS 442.255 and NRS 442.2555's "parental notification" and "judicial bypass" provisions for the first time, forty years after the passage of S.B. 510.

### A.    Parental Notification Requirement

The parental notification requirement requires that "a custodial parent or guardian [of the patient] is personally notified before the abortion" and that if notice is not achieved "after a reasonable effort," the physician must wait to provide the abortion until after they have "notified the parent or guardian by certified mail at the last known address of the parent or guardian." NRS 442.255(1). The text of the statute does not define numerous terms that are central to the statute's enforcement, such as: "personal notification,", "last known address," "reasonable effort," or what it means to have "notified.". *See* Dalton Decl. ¶ 28; *see also* Second Suppl. Br. of Pl. Planned Parenthood Mar Monte, Inc. 9–11 ("Pls.' Second Suppl. Br."), ECF No. 131 (outlining absence of administrable standards for compliance with the notification provisions). Based on the text of the statute, these requirements are equally applicable to circumstances when the custodial parent or legal guardian accompanies the young person to their appointment. Dalton Decl. ¶ 31. For unmarried or unemancipated youth the only alternative to this requirement is to obtain judicial authorization pursuant to the process set forth in subsection (2) of the statute.

If a patient has sought authorization from the court and no decision is issued within one judicial day after their "interview," authorization is "deemed to have been granted." *See* NRS 442.255(3); *see also Glick*, 616 F. Supp. at 325 (discussing "pocket approval" provision). But the

text of the statute fails to provide any guidance regarding how a provider can demonstrate that the abortion was authorized pursuant to this "pocket approval." *Glick*, 616 F. Supp. at 325; Dalton Decl. ¶¶ 32–33. The statute's vague requirements are paired with clear criminal penalties and other consequences; the imprecise requirements open the door to arbitrary and inconsistent enforcement by law enforcement officials and prosecutors. Dalton Decl. ¶¶ 30–33. Thus, while requiring providers to comply with its directives or risk criminal prosecutions, the statute fails to provide adequate information allowing providers to defend against such circumstances. *Id.*

Abortion providers who violate the parental notification requirement are subject to penalties including but not limited to a term of imprisonment of up to six months per violation, a monetary fine of not more than $1,000, or both. *See* NRS 442.257 ("Any person who violates any provision of NRS 442.252 to 442.256, inclusive, is guilty of a misdemeanor"); NRS 193.150 (describing punishment for misdemeanors). A physician may also face disciplinary action, which can include a range of licensure consequences ranging from public reprimands, monetary fines, suspension, to revocation of licenses. *See, e.g.,* NRS 630.301 et. seq. (setting forth grounds for initiating disciplinary actions against licensed providers); Dalton Decl. ¶ 29. Incidental to the imposition of NRS 442.255's requirements, Nevada requires physicians to maintain a record for at least five years of "[a] description of efforts to give any notice required by [the parental notification requirement]." NRS 442.256. But this provision, too, lacks detail as to what must be recorded. A violation of this record-keeping provision is subject to the same criminal penalties as a violation of the underlying parental notification requirement. NRS 442.257.

## B.  Judicial Bypass Provisions

For most unmarried or unemancipated young people for whom a provider is unable to provide "personal notification" to the custodial parent or legal guardian, the only access to abortion services in Nevada requires obtaining a court order through a multi-step judicial bypass process codified in NRS 442.255 and 442.2555.

But the judicial bypass process exists only on paper. No statutory provisions, administrative rules, or policies have been created to ensure proper and uniform implementation

across Nevada's eleven judicial districts, or to guarantee accessibility to those needing a judicial bypass order on or after April 30, 2025. *See* NRS 442.255(4); NRS 442.2555(5) (exempting actions from applicable rules of civil and appellate procedure). These provisions suffer from the same flaws as the parental notification provision: they do not define the essential terms underlying the adjudicatory process set forth in the statute. *See, e.g.,* NRS 442.255(2) (requiring that a person under 18 years "request a district court to issue an order"). Accordingly, it remains uncertain as to how individuals throughout Nevada can access these processes. Dalton Decl. ¶¶ 34–35. The lack of guidance extends to critical matters such as the initial procedures necessary to commence a review of a request for judicial authorization, the process for appointment of competent county-funded counsel to represent individuals during appeals, and the basic information necessary to ensure that adjudicatory procedures are practicably accessible to all entitled to access a right or benefit through them. *See* Pls.' Second Suppl. Br. 8-9 , ECF No. 131

### C.  Potential Effects of SB 510's Implementation

Critically, the only young people not subject to the vague "parental notification" and "judicial bypass" provisions are: (1) those for whom the attending physician has determined that an abortion is "immediately necessary to preserve the patient's life or health," (2) emancipated young people, and (3) married patients under eighteen years of age. *See* NRS 442.255(1). Notably, these provisions do not exempt from the parental notification and judicial bypass requirement young people whose pregnancy is the result of incest to which the parent or guardian was a party or when the parent or guardian has abused the young person. *See also* Dalton Decl. ¶ 24.

On April 30, 2025, all young people who do not fall within the statutory exemptions will be subject to the "parental notification" requirement in order to obtain an abortion. Beginning that day, the statute requires that any patient unable to *present* a judicial bypass authorization or satisfy the alternative vague "personal notification" requirement must be denied care. Dalton Decl. ¶ 35. As of today, there is no evidence that the adequate procedural structures will be in place to allow a young person to obtain judicial authorization by April 30, 2025. This void leaves young people without the ability to access and navigate the requisite statutory processes to obtain an abortion,

1    risking that for some, the statutory right will be extinguished due to Nevada's gestational limits.

2    *See* NRS 442.250.

### JURISDICTION AND LEGAL STANDARD

4    While the filing of a notice of appeal generally divests district courts of jurisdiction over

5    the matters being appealed, "[t]he district court retains jurisdiction during the pendency of an

6    appeal to act to preserve the status quo." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d

7    1163, 1166 (9th Cir. 2001); *see also* Fed. R. Civ. P. 62(d). Accordingly, district courts can stay a

8    decision that is the subject of an appeal without disrupting the appellate court's jurisdiction. The

9    party seeking the stay bears the burden of demonstrating that "the circumstances justify an exercise

10   of judicial discretion." *Sierra Club v. Trump*, 929 F.3d 670, 688 (9th Cir. 2019) (internal citation

11   omitted) (quoting *Nken*, 556 U.S. at 433–34). In evaluating a request for stay pending appeal,

12   courts consider: (1) the likelihood of success on the merits, (2) whether the movant will suffer

13   irreparable harm absent a stay, (3) whether the grant of a stay will substantially injure the other

14   party, and (4) the public interest. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,

15   512 F.3d 1112, 1115 (9th Cir. 2008); *see also Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th

16   Cir. 2024). When the government is a party, its interests and the public interest "merge." *Nken*,

17   556 U.S. at 435.

18   In evaluating the request for a stay, "[t]he first two factors . . . are the most critical" and

19   courts will only consider the remaining two factors "if the first two factors are satisfied." *Doe #1*

20   *v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (internal citation omitted). The Ninth Circuit has

21   adopted a sliding scale approach to weighing these first two factors in which "the required degree

22   of irreparable harm increases as the probability of success decreases." *Mi Familia Vota*, 111 F.4th

23   at 981 (internal citations and quotations omitted). "On one end of the continuum, the proponent

24   must show a 'strong likelihood of success on the merits' and at least 'the possibility of irreparable

25   injury to the [proponent] if preliminary relief is not granted.'" *Id.* (internal citations omitted). "At

26   the other end of the continuum, the moving party must demonstrate that serious legal questions are

27   raised and that the balance of hardships tips sharply in its favor." *Id.* (internal citations omitted);

28

*see also Applications in Internet Time, LLC v. Salesforce, Inc.,* No. 3:13-CV-00628-MMD-CLB, 2024 WL 5088486, at *1 (D. Nev. June 24, 2024) (citing *Golden Gate Rest. Ass'n*, 512 F.3d at 1119).

## ARGUMENT

On balance, all factors weigh strongly in favor of maintaining the pre-Rule 60(b) Order status quo. Planned Parenthood Mar Monte can demonstrate that a stay of this Court's decision is warranted, to prevent NRS 442.255 and NRS 442.2555 from going into effect on April 30, 2025, during the pendency of PPMM's appeal to the Ninth Circuit.[6]

### I.    Likelihood of Success on the Merits or Serious Questions

The first factor, "likelihood of success," requires at minimum that a moving party demonstrate a "substantial case for relief on the merits." *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012). Thus, a "'reasonable probability' of success is required, otherwise described as a 'fair prospect' of success, the existence of 'a substantial case on the merits,' or a showing that 'serious legal questions' have been raised. *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-CV-01667-ART-VCF, 2024 WL 3047560, at *1 (D. Nev. June 18, 2024) (internal citation omitted); *see Mi Familia Vota*, 111 F.4th at 981. At this stage, "the likelihood of success on the merits is a particularly troublesome factor because it requires the court to essentially predict that it has rendered an erroneous decision." *U.S. Bank, N.A. v. SFR Invs. Pool 1, LLC*, No. 2:15-CV-1527 JCM, 2021 WL 9316302, at *2 (internal quotations and citations omitted). "[I]t is enough that the stay applicant has raised serious legal questions going to the merits, so serious, substantial, and difficult as to make them a fair ground of litigation and thus for more deliberate investigation." *Id.* (internal quotations and citations omitted). "An applicant for a stay 'need not demonstrate that it is more likely than not they will win on the merits,' but rather must show a reasonable probability' or 'fair prospect' of success." *Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 966–67 (9th Cir. 2011)); *see Las Vegas Sun*, 2024 WL 3047560,

---

[6] In the alternative, PPMM respectfully requests narrower relief: the issuance of a temporary administrative stay to allow it to seek and obtain a ruling from Ninth Circuit on a motion to stay.

at *1, (finding that this factor "sets a relatively low bar for success" and was satisfied "at the least", the applicant raised "serious questions on the merits" when there was a novel question). PPMM can demonstrate that it is likely to succeed on the merits of its appeal, or at minimum, the existence of "serious legal questions" to where there is a reasonable probability or fair prospect of success. *See Qualcomm Inc.*, 935 F.3d at 756.

PPMM maintains that it is likely to succeed, or in the alternative, can demonstrate that serious questions on the merits exists as to a central issue in this case: whether in determining whether to grant Rule 60(b)(5) relief, this Court could consider equitable factors and evaluate whether the proposed modification and vacatur of the 1991 *Glick* permanent injunction would result in independent constitutional violations. PPMM respectfully maintains that at minimum, a "fair prospect" exists that the Ninth Circuit will determine this question differently than this Court, and that the issue presents serious questions on the merits.

Indisputably, this Court's evaluation of the District Attorneys' Rule 60(b) Motion required parsing through, analyzing, and reconciling several strands of U.S. Supreme Court and binding Ninth Circuit precedent to determine the appropriate legal standards governing the District Attorneys' "inequity provision" argument based on *Dobbs*. *See* Order Granting Joint Mot. for Briefing Schedule, ECF No. 112 (scheduling order setting briefing in response to Rule 60(b) Motion, ECF No. 83); ECF Nos. 121, 122, 123, 124 (Corresponding Motion, Minute Order, and First Supplemental Briefs); ECF Nos. 120 (Order Scheduling Motion Hearing) and 127 (Minutes of Proceeding for Motion Hearing); ECF Nos. 126, 131, and 133 (Order on Supplemental Briefing Requested and responsive Second Supplemental Briefs). Specifically, this Court had to reconcile tensions between three binding Ninth Circuit cases: *California by and through Becerra v. EPA,* 978 F.3d 708 (9th Cir. 2020)*, Am. Unites for Kids v. Rousseau,* 985 F.3d 1075 (9th Cir. 2021)*, Bellevue Manor Assocs. v. United States,* 165 F.3d 1249 (9th Cir. 1999) and the Supreme Court's decisions in *Agostini v. Felton*, 521 U.S. 203 (1997) and *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), to determine the legal standards applicable to this Rule 60(b)(5) motion. *See,*

1   *e.g.,* Order on Suppl. Briefing, ECF No. 126.[7]

2       The tensions inherent in discerning the appropriate standard are illustrated by another

3   decision coincidentally issued by a District Court in this circuit on the same day that this Court

4   issued its Rule 60(b)(5) decision. *See Warren v. City of Chico*, No. 2:21-CV-00640-DAD-DMC,

5   2025 WL 974068 (E.D. Cal. Mar. 31, 2025). There, applying Ninth Circuit precedent and invoking

6   *Bellevue Manor Assocs.*, 165 F.3d at 1257, the district court reaffirmed that the *Rufo* standard is

7   not limited to institutional reform cases but applies to all motions brought under the Rule 60(b)(5)'s

8   "inequity provision." *Warren*, 2025 WL 974068, at *6. Next, agreeing that there had been a change

9   in law, *id.* at *7, and acknowledging *Becerra* in its analysis, the court noted that "the Ninth Circuit

10  has directed courts to 'take all the circumstances into account in determining whether to modify

11  or vacate a prior injunction or consent decree.'" *Id.* (internal citations and quotations omitted).

12  Applying *Bellevue Manor* and *Orantes-Hernandez v. Gonzales*, 504 F. Supp. 2d 825, 830 (C.D.

13  Cal. 2007), the court recognized that the circumstances allowed for the consideration of equitable

14  factors in determining whether defendants should continue to be bound by terms of a settlement

15  agreement that had prospective effect in light of an intervening U.S. Supreme Court decision.

16      The court's application of equitable factors in *Warren* supports that *Bellevue Manor*'s

17  holding that *Rufo*'s (b)(5) standard applies to *all* relief sought under the rule's "inequity provision"

18  remains undisturbed in this Circuit, even post-*Becerra*. As such, *Rufo*'s interpretation of the

19  "suitably tailored" analysis, which explicitly includes that "a modification must not create or

20  perpetuate a constitutional violation," *Rufo*, 502 U.S. at 391, is at odds with this Circuit's precedent

21  in *Becerra*. In *Becerra*, no party argued that independent legal grounds existed for preserving the

22  injunction in order to avoid creating or perpetuating a constitutional violation. And while *Becerra*

23  bars courts from maintaining injunctions based on equitable factors alone, it does not expressly

24  require abandoning or disregarding *Rufo*'s inquiry into whether the existence of independent legal

---

[7] This Court's Order noted, "[t]he parties dispute whether the Court must consider other equitable factors in deciding this motion for relief under 60(b)(5) . . . . However, it is clear that a modification under Rule 60(b)(5) 'must not create or perpetuate a constitutional violation.' Thus, Court must consider Plaintiff's arguments regarding alternative constitutional grounds for maintaining the injunction.".

grounds counsel against the modification of an injunction. *See Becerra*, 978 F.3d at 714 (noting that the states had requested preservation of the injunction *exclusively* on equitable considerations involving a "balancing of the harms to the parties"); *id.* at 717 (holding that "once the legal basis for an injunction has been removed, such that the law now permits what was previously forbidden, it is an abuse of discretion to not modify the injunction").

Given *Becerra*'s unique factual context,[8] its holding does not resolve the tensions in the case law. *Becerra* leaves open the question of whether in determining if "the law now permits what was previously forbidden" courts are required, or merely allowed, to assess independent *legal* grounds to avert *Rufo*'s warning in determining whether a modification is suitably tailored to changed circumstances. Nor did the Ninth Circuit implicitly consider this issue in *Becerra*, as the states never argued that any independent legal basis counseled against dissolving the ongoing injunctive relief. *See* Appellee's Br., *Becerra v. EPA*, No. 19-17480, 2020 WL 1452838, at *23 (9th Cir. Mar. 16, 2020) ("A district court has discretion to deny a Rule 60(b)(5) motion even when the law no longer requires what the judgment commands.").

Separately, the Ninth Circuit has not confined the application of *Rousseau/Rufo*'s analysis exclusively to "changed circumstances" when a party alleges "changed factual conditions." *Rousseau*, 985 F.3d 1075; *Rufo*, 502 U.S. 367. Post-*Becerra*, the Ninth Circuit reaffirmed that "if the moving party cites significantly changed circumstances, it must also show that the changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest." *Rousseau*, 985 F.3d at 1097–98 (citing *Rufo*, 502 U.S. at 384). As this Court acknowledged, at least two other district courts in this Circuit have cited *Rousseau* and *Rufo* as applicable in assessing Rule 60(b)(5) motions for relief when a party has asserted "changed

---

[8] There, the underlying regulation, which imposed a specific requirement upon the agency and served as the basis for a mandatory injunction compelling the agency to take certain actions in accordance with said requirement, was amended in such a manner that the original underlying requirement compelling injunctive relief had been repealed. *Becerra*, 978 F.3d at 712. For such factual circumstances to be indistinguishable from the facts here, the original *Glick* injunction would have to have *required* the State of Nevada to create an operational judicial bypass system that comported with constitutional requirements only for the Nevada Legislature to subsequently repeal NRS 442.255(2)-(4) and NRS 442.2555.

circumstances" on the basis of a change in law. *See* Rule 60(b) Order 20 n.6 (citing *Planned Parenthood Fed'n. of Am., Inc. v. Ctr. for Med. Progress*, 704 F. Supp. 3d 1027, 1035–37 (N.D. Cal. 2023), *appeal dismissed*, No. 23-4398, 2024 WL 3153369 (9th Cir. May 24, 2024) and *Natl. Abortion Fed'n. v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2024 WL 1286936, at *3–4 (N.D. Cal. Mar. 25, 2024)). While those courts found that the movants had failed to satisfy the *Rousseau*/*Rufo* analysis's first step (whether the intervening authority constituted a "significant change in law"), the decision's *outcome* did not alter the standards applied in determining whether to grant Rule 60(b)(5) relief. At minimum, PPMM can demonstrate that there are "serious legal questions" as to which standard applies to Rule 60(b)(5) motions alleging a "significant change in law" and whether courts are barred from considering independent legal grounds that counsel against modification of the injunction under *Rufo*.

## II.   PPMM, Its Providers, and Patients Will Suffer Irreparable Harm if the Enjoined Provisions Are Allowed to Be in Effect Throughout the Pendency of the Appeal

Absent a stay, Planned Parenthood Mar Monte, its patients under the age of eighteen, and its providers, will be irreparably harmed by the sudden and standardless enforcement of Nevada's parental notification and judicial bypass provisions while the Ninth Circuit resolves the appeal. To satisfy this factor, movants must demonstrate irreparable harm absent a stay. *Mi Familia Vota*, 111 F.4th at 981; *Doe #1*, 957 F.3d at 1059.

Presently, the parental notification and judicial bypass provisions contain vague statutory directives mandating that a provider "personally notify" a custodial parent or guardian, even when a young person involves them in this decision. Dalton Decl. ¶¶ 31, 37. Because the parental notice requirement is sketched out in the barest of terms, its ambiguities leave providers vulnerable to arbitrary and inconsistent enforcement and imposition of criminal penalties. Dalton Decl. ¶¶ 30–33. In circumstances where a patient is entitled to a "pocket approval" of their bypass request, the statute's silence regarding the process leaves providers unable to demonstrate compliance. *See* Pls. Second Suppl. Br. 9–11, ECF No. 131 (outlining vagueness concerns related to statutory terms). Dalton Decl. ¶¶ 32–33. And even when a young person involves a custodial parent or legal

1    guardian, the statute fails to prescribe clearly what is expected to prevent inappropriate

2    enforcement by law enforcement officials and prosecutors.

3        A young person who chooses not to demonstrate eligibility through "personal notification"

4    of a parent or guardian may seek court authorization through the "judicial bypass"[9] process set

5    forth in the statute, but this route is equally indiscernible. Because S.B. 510 does not adequately

6    describe the process that a patient seeking a judicial bypass order must follow, *see e.g., Glick*, 616

7    F. Supp. at 325 n.2, and the adjudicatory procedures for obtaining the requisite authorization

8    continue to exist only in the words of the statute, such orders are inaccessible and remain so until

9    further legislative and judicial steps are taken. *See* Pls.' Second Suppl. Br. 8–9, ECF No. 131

10   (detailing critical aspects for implementation of the judicial bypass scheme that do not exist or are

11   not set forth in the statute); *e.g.,* NRS 442.2555(1) (requiring that the the court appoint counsel to

12   represent young people in the appellate process whose "compensation and expenses" are to be paid

13   for by "the county"). Likewise, because NRS 442.255(3) and NRS 442.2555(5) exempt these

14   actions from the Nevada Rules of Civil Procedure and Nevada Rules of Appellate Procedure, the

15   Nevada Supreme Court–or potentially each of the eleven separate judicial districts–must

16   promulgate rules, in accordance with its internal rulemaking processes, that are consistent with the

17   Nevada State Constitution and all applicable laws to govern these proceedings. *See* NRS 2.120.

18   Thus, a fundamentally unclear judicial bypass process will be expected to take effect on April 30,

19   2025, when Nevada's abortion providers will be forced to require that certain patients present

20   evidence of judicial authorization.

21       As of April 30, 2025, the parental notification and judicial bypass provisions will serve as

22   a constructive barrier to abortion access for unmarried or unemancipated patients under eighteen.

23   The demand that physicians provide "parental notification" in opaque terms, and the absence of a

24

---

25   [9] Young people may choose to not involve a parent in their decision for a variety of deeply
     personal reasons, including personal safety concerns and fear that they will be forced to continue
26   the pregnancy against their wishes. *See* Dalton Decl ¶ 24; Mot. for Leave to File Br. of Amici
     Curiae in Supp. of Pl. ("Amici Curiae"), Ex. A, at 3–6, ECF No. 113 (detailing why certain
27   young people choose to not involve parents in this decision and the potential harms caused by
     delaying access to abortion care).

28

meaningful judicial bypass process, will inevitably result in delayed access to care or a *de facto* ban for young people who do not wish to involve a custodial parent or legal guardian in this decision, or are unable to sufficiently demonstrate compliance with the parental notification requirement. For providers, the vague provisions mandate adherence to the statute at the risk of criminal penalties while simultaneously lacking guidance as to how they can defend against arbitrary and inconsistent enforcement by law enforcement and prosecutors, even when their actions are authorized by the statute. *See, e.g.,* Dalton Decl. ¶¶ 31–33. These deficiencies place providers in equally onerous situations: attempt to comply with ambiguous law susceptible to arbitrary enforcement while risking significant penalties and reputational damage, or delay or withhold time-sensitive medical care from a category of patients.

Accordingly, absent a stay of the Rule 60(b) Order during the pendency of the appeal, PPMM, its patients under the age of eighteen, and its staff will experience numerous forms of irreparable harm. Young people who make the decision to terminate a pregnancy but cannot demonstrate that they satisfy the parental notification or judicial authorization requirements will suffer a range of physical, emotional and financial consequences as a result of being forced to carry a pregnancy to term and for some, parent against their will. The statutory provisions' enforcement will also irreparably harm young people whose care is delayed while they attempt to seek an order through a judicial bypass system that remains unestablished. Finally, for PPMM, its providers, and staff, enforcement of the parental notification and judicial bypass provisions will result in irreparable harm as a result of credible threats of criminal and licensing penalties if deemed to be out of compliance, and related reputational harm. The resolution of the appeal in this case will not undo the irreparable harm that patients and providers will experience during the pendency of the appeal.

### A. Physical, Emotional and Financial Costs of Being Forced to Carry a Pregnancy That a Young Person Has Decided to End

Absent a stay, young people unable to demonstrate compliance with NRS 442.255(1), or unable to obtain the requisite order will be required to carry a pregnancy to term against their will,

with the physical, emotional, and financial effects that this entails. Indeed, "[t]here are few situations in which denying a minor the right to make an important decision will have consequences so grave, permanent, and indelible." *Planned Parenthood of Mont. v. Montana*, 554 P.3d 153, 169 (Mont. 2024).

In a variety of contexts, the Ninth Circuit has repeatedly recognized that the delay and denial of access to necessary medical care and the consequences that may flow from that constitutes irreparable injury. *See Harris v. Bd. of Supervisors, Los Angeles Cnty.,* 366 F.3d 754, 766 (9th Cir. 2004) (affirming irreparable harm when patients may face numerous physiological harms, medical complications, and risk of death due to delayed treatment); *e.g., Beltran v. Myers,* 677 F.2d 1317, 1322 (9th Cir. 1982); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1324 n.5 (9th Cir. 1994) (recognizing that emotional distress, depression, and anxiety may constitute irreparable injury); *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 511 (9th Cir. 1992), as amended (Feb. 12, 1993) (recognizing that irreparable physical and emotional injuries to a party are sufficient for establishing irreparable harm). Delays in necessary treatment and pain can constitute irreparable harm. *See Beitman v. Correct Care Sols.*, No. CV 17-08229-PCT-JAT, 2022 WL 36814, at *2 (D. Ariz. Jan. 4, 2022; *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (stating irreparable "harm includes delayed and/or complete lack of necessary treatment, and increased pain"). For unmarried and unemancipated young people constructively denied abortion access because of the inability to demonstrate compliance with NRS 442.255(1), forcing them to carry a pregnancy to term constitutes irreparable harm. Likewise, as a result of structural and operational barriers, those unable to fully access the judicial bypass scheme to vindicate their statutory right to abortion will experience the same form of irreparable harm.

Young people, in general, face unique and significant barriers to accessing abortion services. *See* Ex. C, *Elevating the Needs of Minor Adolescents in a Landscape of Reduced Abortion Access in the United States*, at 530. Indisputably, the alternative to abortion is carrying a pregnancy to term and childbirth. In adults, being forced to carry a pregnancy to term and bear children can result in a range of physical, mental, and economic consequences. Dalton Decl. ¶¶ 14–21. These

consequences for young people in similar circumstances can be magnified.

Even in "uncomplicated" pregnancies, a patient may experience a wide range of physiological challenges, some of which can exacerbate pre-existing health conditions or result in the onset of new and debilitating health conditions that are unique to pregnancy that can have long term consequences. *See* Dalton Decl. ¶¶ 14–16; *see Planned Parenthood Ass'n of Utah v. Utah,* 554 P.3d 998, 1042 (Utah 2024) (affirming irreparable harm finding in light of the physical, emotional, and financial impact of forcing a person to carry an unwanted pregnancy to term). The mental health risks associated with pregnancy can be higher for patients with unintended pregnancies. *See* Ex. D, *Unintended Pregnancy and Associated Maternal Preconception, Prenatal and Postpartum Behaviors,* at 197. Young people experience many pregnancy-related complications at higher rates than adults, and in general face exacerbated pregnancy risks. *See* Ex. E, *A Review of the Risks and Consequences of Adolescent Pregnancy,* at 2-3 (finding that adolescent pregnancy is associated with increased risks of maternal and neonatal complications during the prenatal and postnatal period).

Labor and childbirth also carry significant risks. Forced pregnancy, childbirth, and parenting have consequential social and economic impacts on a person's life. *See Planned Parenthood Ass'n of Utah*, 554 P.3d at 1042 (recognizing pregnancy's impact on an individual's ability to work and the correlations between pregnancy-related discrimination and lower earnings "both during pregnancy and over time"). As one court recently noted:

> [A]bortion care is one of the safest forms of medical care available in this country and the world. Medical risks for abortion are considerably lower than for pregnancy and childbirth, and, in general, adolescents show no substantial psychological effects from abortion. The consequences of not being able to terminate an unwanted pregnancy can be decidedly more traumatic and severe than for obtaining an abortion. Adolescent mothers may not be able to complete high school and will remain dependent on family, a partner, and unable to take care of themselves.

*Planned Parenthood of Mont.*, 554 P.3d at 171–72[10].

---

[10] *See also* Ex. F, *Diploma Attainment Among Teen Mothers* (discussing findings showing impact of teenage pregnancy and birth on educational outcomes); Ex. G, *Socioeconomic Disadvantage as a Social Determinant of Teen Childbearing in the U.S.*, at p. 20 (discussing findings that teenage pregnancy is associated with higher rates of poverty and reduced wages

**B.  Challenges in Effectuating Parental Notification or Inability to Obtain Judicial Authorization Will Delay Access to Care for Patients**

Should the parental notification and judicial bypass provisions go into effect throughout the pendency of the Ninth Circuit Appeal, patients unable to demonstrate parental notification or obtain a court order will be irreparably harmed by being forced to delay care. The unclear and currently indiscernible bypass process may force young people into involving custodial parents or legal guardians, at the expense of their personal safety concerns, just to access care to which they are statutorily entitled. Alternatively, faced with the challenge of accessing an adjudication of a request for judicial authorization in a convoluted ad hoc system, some may abandon their right to seek an abortion altogether. *See* Amici Curiae, Ex. A, at 10–12, ECF No. 113 (describing significant emotional harm of being subjected to inadequate bypass processes). And for some, the delays caused by inability to access the adjudicatory processes may extinguish the right altogether by delaying an order beyond the gestational limits set forth in NRS 442.250. And many of the same irreparable harms experienced by patients forced to carry a pregnancy to term, *see supra* Part II(A)*,* will be experienced by patients forced to remain pregnant while seeking a court order. Each of these circumstances have been recognized to constitute "irreparable harm." *See, e.g., Memphis Planned Parenthood, Inc. v. Sundquist,* 2 F. Supp. 2d 997, 1007 (M.D. Tenn. 1997), *rev'd on other grounds*, 175 F.3d 456 (6th Cir. 1999) ("Either harm constitutes irreparable injury, whether abuse, forced pregnancy, or delayed abortion occur as a result."); *Williams v. Zbaraz*, 442 U.S. 1309, 1314–15 (1979) (Stevens, J.) (in denying a stay determining that increased risk of morbidity and mortality due to seeking abortion at a later gestational age when an individual was forced to remain pregnant supported "plaintiff's claims of irreparable injury").

**C.  Threat of Criminal and Licensing Penalties and Reputational Harm to PPMM, Its Providers, and Staff**

Lastly, enforcement of the parental notification and judicial bypass requirements will irreparably harm PPMM, its providers, and staff who face criminal and licensing penalties, as well

_____

throughout a person's lifetime).

as reputational harm caused by these penalties, if accused of or found to be in violation of NRS 442.255 and NRS 442.2555. *See* Dalton Decl. ¶¶ 29, 36, 38–39. Providers are faced with an impossible choice: divining how to demonstrate compliance with vague and opaque statutory requirements at the risk of criminal prosecution and civil penalties, or delaying or denying time sensitive health care to minor patients until methods for extinguishing this risk are created.

Courts have recognized that irreparable harm may occur when medical providers are required to act in ways that contradict their ethical obligations and best judgments, or by withholding care. *See, e.g., Mayor & City Council of Baltimore v. Azar,* 392 F. Supp. 3d 602, 618–619 (D. Md. 2019) (irreparable harm exists when government requirements force doctors to engage in unethical practice of medicine endangering the lives of patients); *Richmond Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998) (finding irreparable harm when statutory restrictions would require providers to "alter their medical advice to, and their medical care of, their patients, contrary to the best professional medical judgments" and would "chill the plaintiffs' ability to provide safe medical care for their patients who choose, or who are required for medical reasons to obtain, [lawful] abortions") (collecting cases).

Courts have recognized that the risk of governmental enforcement actions, including criminal and civil penalties, suffices to demonstrate irreparable harm. *See, e.g., Cal. Trucking Ass'n v. Becerra,* 433 F. Supp. 3d 1154, 1169 (S.D. Cal. 2020)*, rev'd on other grounds sub nom. Cal. Trucking Ass'n v. Bonta,* 996 F.3d 644 (9th Cir. 2021); *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 857 (N.D. Tex. 2022); *Olson v. California*, No. CV 19-10956-DMG (RAOX), 2020 WL 905572, at *14 (C.D. Cal. Feb. 10, 2020), *aff'd*, 104 F.4th 66 (9th Cir. 2024) ("When plaintiffs are faced with 'Hobson's choice' of 'continually violat[ing]' a law and exposing themselves to 'potentially huge liability' or 'suffer[ing] the injury of obeying the law during the pendency of the proceedings and any further review,' the Ninth Circuit has found imminent harm.") (internal citations omitted).

Here, the threat of enforcement of criminal penalties for failure to comply are well beyond speculative when the parties seeking relief from the permanent injunction are district attorneys

whose offices have the statutory authority to enforce criminal penalties. *See* Reply in Supp. of Mot. for Relief from J. Under Fed. R. Civ. P. 60(b)(5) 7, 8, ECF No. 116 ("This resounds strongly here, where an interest in *enforcing* health-related state laws is at stake[.]") (emphasis added). Because the State of Nevada and the remaining Defendants have not disavowed enforcement, and the District Attorneys have confirmed throughout their briefing an interest in enforcing NRS 442.255 and NRS 442.2555, providers are able to establish the existence of a credible threat of enforcement. *Cf. Tingley v. Ferguson,* 47 F.4th 1055, 1068 (9th Cir. 2022) (recognizing that a party can establish credible threat of enforcement, in the injury-in-fact context, when the government does not disavow enforcement of a law and provides generalized statements of enforcement of restriction).

Faced with the parental notification provision's ambiguous statutory requirements, abortion providers must balance their reasonable understanding of the conduct proscribed by the statute with the risks of arbitrary and uneven enforcement informed by ideological opposition to and hostility directed against them. *See* Dalton Decl. ¶ 39. As one court has noted, "[e]lected officials hold wide-ranging moral and political opinions about abortion, and the political environment in a particular jurisdiction might also affect how law enforcement officials evaluate their role and responsibilities [in enforcing a vague provision]." *Planned Parenthood S. Atl. v. Stein*, 742 F. Supp. 3d 472, 484 (M.D.N.C. 2024). In light of the national climate and continued efforts to intimidate and harass abortion providers, the fear of politicized enforcement of abortion statutes is credible–even in circumstances where the state's laws allow for the provision of abortions. *See* Dalton Decl. ¶ 39; *cf. Bryant v. Woodall,* 1 F.4th 280, 285–88 (4th Cir. 2021), as amended (June 23, 2021) (rejecting argument that it was unlikely that abortion providers faced threat of prosecution because of historic-nonenforcement of statute given numerous efforts over the years locally and nationally restrict or impede access to abortion). Accordingly, in the absence of statutory constraints forbidding law enforcement officers and prosecutors from enforcing the law arbitrarily and inconsistently, all parties are left to guess how to comply with a vague law that carries criminal penalties. Providers face a real risk that law enforcement officials and prosecutors,

1    beginning April 30, 2025, will attempt to investigate and enforce the parental notification

2    requirements in inconsistent ways. *Cf. Stein*, 742 F. Supp. 3d at 485–86 (describing in the

3    vagueness context the risks of arbitrary enforcement faced by abortion providers when a statutory

4    requirement can reasonably be understood as requiring different forms of compliance when crucial

5    terms are undefined).

6         Likewise, the requirement that providers enforce these requirements while leaving them

7    without information to share with patients as to how such requirements can be fulfilled, will erode

8    trust that patients have in seeking health care services. *See* Dalton Decl. ¶ 36. By threatening

9    providers with criminal harm, the statute requires them to carry out the policy of the state, even

10   when such policy contradicts their medical judgment or inherently leaves the ability of a patient to

11   fulfill a prerequisite to a third party. *Id.*

12   **III.    The Remaining Stay Factors Weigh in Favor of Granting a Stay**

13        Should a stay of the Rule 60(b) decision be granted, the District Attorneys will not be

14   substantially injured. Nor would the grant of a stay pending the Ninth Circuit's resolution of the

15   appeal be adverse to the public interest. Because the stay sought here is against a governmental

16   entity, the third and fourth factors "merge." *Nken*, 556 U.S. at 435.

17        Throughout the course of the Rule 60(b) filings, the District Attorneys have advanced

18   speculative and conclusory injuries, which alone are insufficient to tip the scales in their favor. *Al*

19   *Otro Lado*, 952 F.2d at 1007; *see also Doe #1*, 957 F.3d at 1059–60 (in considering irreparable

20   harm to government, "[t]he government cannot meet this burden by submitting conclusory factual

21   assertions and speculative arguments that are unsupported in the record."). Nor can the District

22   Attorneys identify specific factual harms resulting from maintenance of injunctive relief that has

23   been in place for four decades. After nearly four decades without S.B. 510 in force, Defendants

24   cannot credibly claim any substantial injury or *irreparable* harm that they would experience should

25   a stay be granted caused by a few more months of non-enforcement throughout the pendency of

26   this appeal. *See Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1272 (N.D. Cal. 2023) (in the stay

27   context, declining to find the existence of irreparable harm when the alleged harm that party

28

1    asserted would occur was the status quo).  At a practical level, the injury that would be caused by

2    granting a stay would be barring the District Attorneys from prosecuting a misdemeanor that they

3    have been enjoined from prosecuting for almost forty years. The harm experienced by PPMM, its

4    providers, and young people seeking access to abortion substantially outweighs this potential

5    harm. Likewise, the public interest lies with maintaining the *status quo* while the appeal is pending.

6    *See Doe #1*, 957 F.3d at 1068 (the public interest "lies with maintaining the status quo while the

7    appeal is pending" when "[f]or countless decades, a stable immigration system has provided for

8    families to be united through a visa system [without imposing a new requirement]"); *City of*

9    *Chicago, Ill. v. Fulton*, 592 U.S. 154, 158 (2021) (internal citations omitted) ("Taking the

10   provision's operative words in turn, the term 'stay' is commonly used to describe an order that

11   'suspend[s] judicial alteration of the status quo.'").

12       Additionally, the public interest is served by the preservation of access to care for young

13   people, which would be hindered by the implementation of the ambiguous parental notification

14   and judicial bypass provisions pending appellate review of this Court's decision. *See Planned*

15   *Parenthood Ass'n of Utah*, 554 P.3d at 1045 (affirming a district court's finding that restraining

16   the enforcement of an abortion law "would not be adverse to the public interest because it would

17   maintain the status quo of women's health treatment as it has been legally permitted for nearly fifty

18   years"); *Leddy v. Becerra*, 617 F. Supp. 3d 116, 125 (E.D.N.Y. 2022) (finding that public interest

19   "overwhelmingly" weighed in favor of ensuring that patients could continue receiving medical

20   care when there was "not even a hint of substandard health care being provided").

21       The public interest in Nevada, too, lies in ensuring that Nevada's laws are administered in

22   a manner that effectuates the principles and guarantees of equality and nondiscrimination that

23   Nevadans have enshrined in their constitution. Notably, Article I, Section 24 of the Nevada

24   Constitution explicitly enshrines that the "[e]quality of rights under the law *shall not be denied or*

25   *abridged* by this State or any of its political subdivisions *on account of* race, color, creed, *sex*,

26   sexual orientation, gender identity or expression, *age*, disability, ancestry or national origin."

27   (emphasis added). Taking into account the restrictions placed on accessing a time sensitive form

28

of health care that would be implicated by the enforcement of this Court's decision, these factors also weigh in favor of granting a stay.

Lastly, the public interest that potentially existed in enforcing a statute passed by the legislature in 1985 has been supplanted by subsequent legislative and electoral actions to protect and expand access to abortion care. *See* Pls.' Second Suppl. Br. 24–25, ECF No. 131 (detailing post-1985 legislative and ballot measures passed protecting and expanding access to abortion and young people's authority to consent to their own medical care).

The balance of harms tips heavily in favor of granting PPMM's motion to stay the Rule 60(b) ruling. While PPMM, its providers, patients, and young people throughout Nevada will suffer serious harms if this Court's order goes into effect, Defendants only stand to lose the inability to enforce two statutes that they have been barred from enforcing for almost forty years pending the Ninth Circuit's review of the underlying decision.

## IV.    Alternatively, This Court Should Grant a Temporary Administrative Stay Allowing Planned Parenthood Mar Monte to Seek a Stay Before the Ninth Circuit

In the alternative, PPMM respectfully moves this Court for a temporary administrative stay of the Rule 60(b) Order allowing Planned Parenthood Mar Monte to seek the resolution of a stay motion before the Ninth Circuit. *See* Ninth Circuit Rule 27-2. "An administrative stay is limited in nature and duration—it is intended to 'minimize harm while an appellate court deliberates' and lasts 'no longer than necessary to make an intelligent decision on the motion for a stay pending appeal.'" *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, No. 25-1677, 2025 WL 835337, at *2 (9th Cir. Mar. 17, 2025) (internal citation omitted), *stay granted sub nom, OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (Apr. 8, 2025 Sup. Ct.). Such an order "does not constitute in any way a decision as to the merits of the motion for stay pending appeal." *Id.* (internal quotations and citations omitted). Applying the *Nken* factors to a request for an administrative stay, "the key considerations are (1) the relevant status quo, and (2) whether a temporary stay is necessary to preserve that status quo." *Id.* Both of these factors weigh strongly in favor of the grant of a temporary administrative stay. *See supra* Section II–III.

1     Given the decades that the parental notification and judicial bypass provisions have been

2  unenforceable, the marginal delay associated with the time it would take the Ninth Circuit to

3  resolve PPMM's motion to stay enforcement of the Rule 60(b) Order will not not cause much, if

4  any, additional harm to Defendants, who have been enjoined from prosecuting violations of the

5  enjoined provisions within their respective jurisdictions for forty years. *See, e.g., Oracle Int'l Corp.*

6  *v. Rimini St., Inc.,* No. 2:14-CV-01699-MMD-DJA, 2023 WL 5221947, at *5 (D. Nev. Aug. 15,

7  2023) (granting temporary stay of injunction when, among other factors, the "marginal delay

8  associated with the [grant of administrative stay]" would not cause "much additional harm" when

9  harm alleged by non-movants had been ongoing for several years).

10                                    **CONCLUSION**

11     Planned Parenthood Mar Monte has demonstrated that all factors favor granting a stay of

12  this Court's Rule 60(b) decision and order vacating the 1991 permanent injunction pending the

13  resolution of its Ninth Circuit appeal. In the alternative, this Court should temporarily stay its

14  decision until the Ninth Circuit rules on PPMM's forthcoming stay or grant any other relief it

15  deems appropriate.

16     Dated this 14th day of April, 2025.

17                              **BRAVO SCHRAGER LLP**

18          By _____*/s/ Bradley S. Schrager*_____

19              BRADLEY S. SCHRAGER, ESQ. (SBN 10217)
                DANIEL BRAVO, ESQ. (SBN 13078)
20
                HANNAH SWANSON, ESQ. *(admitted pro hac vice)*
21              PLANNED PARENTHOOD FEDERATION OF AMERICA

22              VALENTINA De FEX, ESQ. *(admitted pro hac vice)*
                PLANNED PARENTHOOD FEDERATION OF AMERICA
23
                *Attorneys for Plaintiff Planned Parenthood Mar Monte, Inc.*
24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2
  I hereby certify that on this 14th day of April, 2025, a true and correct copy of this

3
**PLAINTIFF'S MOTION FOR STAY OF DISTRICT COURT DECISION** was served via the

4
United States District Court CM/ECF system on all parties or persons requiring notice.

5

6

7
       By  */s/ Dannielle Fresquez*
          Dannielle Fresquez, an Employee of

8
          BRAVO SCHRAGER LLP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28