1  Emily C. Mimnaugh (NV Bar #15287)
   PACIFIC JUSTICE INSTITUTE, Nevada Office
2  1580 Grand Point Way #33171
   Reno, NV 89533
3  Telephone: (916) 857-6900
   Fax: (916) 857-6902
4  emimnaugh@pji.org
   *Designated Resident Nevada Counsel for Defendants Pruyt and Rye*
5  James Bopp, Jr. (IN Bar #2838-84)*
        jboppjr@aol.com
6  Richard E. Coleson (IN Bar #11527-70)*
        rcoleson@bopplaw.com
7  Joseph D. Maughon (VA Bar  #87799)*
        jmaughon@bopplaw.com
8  THE BOPP LAW FIRM, PC
   1 South Sixth St.
9  Terre Haute, IN 47807-3510
   Telephone: (812) 232-2434
10 *Admitted pro hac vice.
   *Counsel for Defendants Pruyt and Rye*

11

## UNITED STATES DISTRICT COURT
12
## DISTRICT OF NEVADA

13  Planned Parenthood Mar Monte, Inc.,
                                    Plaintiff,
14       v.

15  Aaron D. Ford, Nevada Attorney Gen.; Christopher J.        Case No. **3:85-cv-00331-ART-CSD**
    Hicks, Washoe County Dist. Attorney; Garrit S. Pruyt,
16  Carson City Dist. Attorney; Arthur E. Mallory, Chur-       **Response in Opposition to Motion**
    chill County Dist. Attorney; Steven Wolfson, Clark         **for Stay of District Court Decision**
17  County Dist. Attorney; Mark B. Jackson, Douglas
    County Dist. Attorney; Tyler Ingram, Elko County
18  Dist. Attorney; Robert E. Glennen, III, Esmeralda
    County Dist. Attorney; Theodore Beutel, Eureka
19  County Dist. Attorney; Kevin Pasquale, Humboldt
    County Dist. Attorney; William E. Schaeffer, Lander
20  County Dist. Attorney; Dylan V. Frehner, Lincoln
    County Dist. Attorney; Stephen B. Rye, Lyon County
21  Dist. Attorney; T. Jaren Stanton, Mineral County Dist.
    Attorney; Brian T. Kunzi, Nye County Dist. Attorney;
22  Bryce R. Shields, Pershing County Dist. Attorney;
    Anne Langer, Storey County Dist. Attorney; James S.
23  Beecher, White Pine County Dist. Attorney,
                                    Defendants.

On March 31, 2025, this Court granted the relief requested by Defendants Stephen B. Rye, Lyon County District Attorney, and Garrit S. Pruyt, Carson City District Attorney (collectively, "**District Attorneys**"), in their Motion for Relief from Judgment Under Fed. R. Civ. P. 60(b)(5), D. 83 ("**Motion for Relief**"). Order on Defendants' Motion for Relief from Judgment, D. 135 ("**Order**"). Plaintiff Planned Parenthood Mar Monte, Inc. ("**PPMM**") has moved this Court to stay its Order pending PPMM's appeal or, alternatively, to enter an administrative stay. D. 137 ("**Stay Mot.**"). Pursuant to the scheduling order entered by this Court following PPMM's motion for expedited briefing, D. 138, District Attorneys now timely respond. *See* D. 140.

## Legal Standard

PPMM sets forth the legal standard for a stay pending appeal in its Stay Motion, focusing on the "sliding scale" test under which "the required degree of irreparable harm" that the movant must show "increases as the probability of success decreases." D. 137, 9–11 (quoting *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024)). Under this test, the movant must, at the very least, demonstrate that it raised "serious questions going to the merits," in which case the movant must demonstrate that "the balance of hardships tips sharply in [its] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (citation omitted).

Although a somewhat amorphous phrase, various Ninth Circuit decisions shed light on what constitutes a serious question. A serious question may exist where, prior to trial, a party has not met its burden, but a court could reasonably conclude that the party could potentially "produce more evidence at trial to meet its burden of proof." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1422–23 (9th Cir. 1984). More generally, a party may show the existence of serious questions by demonstrating that the issues of the case require "'more deliberative investigation'" than the present stage of litigation has allowed. *Manrique v. Kolc*, 65 F.4th 1037,

1041 (9th Cir. 2023) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). Finally, the mere fact that "there are legal questions not directly answered by past precedent" does not mean that there are "serious questions." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (citation omitted).

## Argument

### I. PPMM cannot show the existence of serious questions.

PPMM cannot make even the minimal required showing concerning the merits. It does not suggest that it simply needs to produce more evidence or that further deliberation might reveal some wrinkle that this Court did not already consider. *See Sierra On-Line*, 739 F.2d at 1422–23; *Manrique*, 65 F.4th at 1041. Instead, it largely rehashes its previous arguments and claims that precedent recognized by this Court as "clear," Order, D. 135, 19 (quoting *California by and through Becerra v. EPA*, 978 F.3d 708, 713–15 (9th Cir. 2020)); *see also id.* at 20 ("clear" that analysis urged by PPMM is *not* applicable here), is, in fact, not so clear. But it offers no real explanation for that claim and thus falls far short of demonstrating the existence of serious questions. It cannot make such a demonstration, and simply ignores the fact that *it*, PPMM, has failed in this litigation to sufficiently develop alternative constitutional arguments that may have supported a conclusion that serious questions exist. Accordingly, this Court may simply find that PPMM has not made the threshold showing for a stay and end its analysis there.

### A. The binding precedent guiding this Court's analysis is clear and well-established.

#### 1. The issue has a resounding answer.

First, PPMM fails because it cannot even show that "there are legal questions" in this case that are "not directly answered by past precedent." *See All. for the Wild Rockies*, 68 F.4th at 497

1   (citation omitted). Because even *that* showing would not, on its own, mean that serious questions

2   exist, *id.*, PPMM's lesser showing means that it has not even begun to approach the starting line.

3       To the contrary: the precedent relied on by this Court is crystal clear, as the Court

4   recognized. There are no questions about it, serious or otherwise. In granting the relief sought by

5   District Attorneys under the inequity prong of Federal Rule of Civil Procedure 60(b)(5)

6   ("**inequity prong**")[1], this Court relied on the Ninth Circuit's admonition that "'[a]n unbroken

7   line of Supreme Court cases makes *clear* that it is an abuse of discretion to deny a modification

8   of an injunction after the law underlying the order changes to permit what was previously

9   forbidden.'" Order, D. 135, 19 (quoting *Becerra*, 978 F.3d at 713–15) (emphasis added). In light

10  of *Becerra* and other guidance and binding case-law, this Court concluded firmly that "a court

11  must modify an injunction if the law underlying it has been overruled, without consideration of

12  equitable factors." *Id.* at 20 (citing 978 F.3d at 716; *Agostini v. Felton*, 521 U.S. 203, 215–17

13  (1997); 12 James W. Moore et al., Moore's Federal Practice - Civil § 60.47[2][c] (3d ed. 2025)).

14      The Court also rejected PPMM's argument under *Rufo v. Inmates of Suffolk County Jail*, 502

15  U.S. 367 (1992), and *America Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021), that it

16  should consider equitable factors, finding it "*clear* from the language of *Rufo* and the court's

17  analysis in *Becerra* that consideration of equitable factors applies when evaluating a request for

18  relief based on changed factual conditions—which is not the case here." *Id.* (citing 502 U.S. at

19  384; 978 F.3d at 716–17) (emphasis added).

20

21

22   [1] The Court found that PPMM's Motion for Relief "is properly evaluated under the
inequity prong . . . ." D. 135, 16. PPMM does not argue that it is likely to succeed on appeal in
challenging the merits of this determination or that there are serious questions concerning same.

23   *See generally* D. 137. Accordingly, the only question is whether there is a basis for a stay
stemming from the Court's analysis *under* the inequity prong.

1    In short, this Court has recognized the long-established and "clear" nature of the binding

2    principle, found in an "unbroken line of Supreme Court cases," that when the legal basis for an

3    injunction is evaporated, the court must vacate the injunction; it has no discretion otherwise. *See*

4    *Becerra*, 978 F.3d 708, 713–15 (9th Cir. 2020)) (citations omitted).

5    **2. PPMM does not refute this clarity.**

6    In the face of this resounding and longstanding clarity, all PPMM says is that the "Court's

7    evaluation . . . required parsing through, analyzing, and reconciling several strands of . . .

8    precedent to determine the appropriate legal standards governing the District Attorneys' 'inequity

9    provision' argument[.]" Stay Mot., D. 137, 11. Based on this "parsing," PPMM claims it "can

10   demonstrate that there are 'serious legal questions' as to which standard applies . . . and whether

11   courts are barred from considering independent legal grounds that counsel against modification

12   of the injunction under *Rufo*." *Id.* at 14. But if PPMM *can* demonstrate such questions, it should

13   simply do so—yet it does not. In any event, this is an odd argument—a court's *job* is analyze

14   precedent, including inapplicable precedent cited by a party. This Court did just that (which is no

15   indication of a lack of clarity in the *applicable* precedent) and correctly found that the line of

16   cases cited by PPMM was not controlling here. A party surely cannot merely festoon its briefs

17   with a sheaf of inapplicable cases and then reasonably expect to be rewarded for same by

18   claiming that means the issue is not clear.

19   PPMM additionally claims that there were "tensions between" the cases it relied upon and

20   the cases correctly cited by the Court as the controlling precedent. *Id.* at 11. But its argument

21   (viz., that there is any tension that was not resolved by the Court's extensive explanation of why

22   *Rufo*, *Rousseau*, and other cases concerning a change in *facts* are not applicable here, in this case

23

1   that concerns a change in *law*[2]) is paper-thin. Aside from simply discussing the fact that the

2   Court considered various cases, PPMM primarily rests its argument on a decision from another

3   district court, *Warren v. City of Chico*, No. 2:21-CV-00640-DAD-DMC, 2025 WL 974068 (E.D.

4   Cal. Mar. 31, 2025). *Id.* at 12. *Warren* does not help PPMM.

5       PPMM claims that *Warren* illustrates "[t]he tensions inherent in discerning the appropriate

6   standard" because that court applied the "*Rufo* standard" to a case in which "there had been a

7   change in law." *Id.* (citation omitted). But while PPMM recognizes the critical fact that that court

8   was determining whether, in light of intervening Supreme Court precedent, "defendants should

9   continue to be bound by terms of a *settlement agreement*," PPMM declines to consider the

10  import of that fact. *Id.* (emphasis added). That declination dooms PPMM's argument because this

11  Court has *already* explained that, under binding precedent, consent decree cases[3] require a

12  different analysis than non-consent decree cases because a consent decree is a "'contract-like

13  judgment that turns on the parties' expectations,' and thus require[s] consideration of the parties'

14  expectations in agreeing to the decree." Order, D. 135, 19 (quoting *Becerra*, 978 F.3d at 716).

15  PPMM does not argue that this rule from *Becerra* is no longer good law, so its failure to explain

16  why it nonetheless considers *Warren* relevant renders its argument weightless.

17      Finally, PPMM also continues to rely on two additional inapplicable cases, *Planned*

18  *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 704 F. Supp. 3d 1027, 1035–37 (N.D.

19  Cal. 2023) ("**PPFA**"), *appeal dismissed*, No. 23-4398, 2024 WL 3153369 (9th Cir. May 24,

---

20      [2]In addition to the Court's explanation of this distinction, District Attorneys provided an
21  extensive explanation in supplemental briefing filed pursuant to this Court's order requiring
    briefing on precisely this question, D. 126, 2 (directing parties to "supplement their briefing to
22  address alternative constitutional grounds for maintaining" the injunction). *E.g.*, D. 133, 10–11,
    10 n.3 ("**Second Supplemental Brief**").

23      [3]The settlement agreement in *Warren* was treated as a consent decree. No. 2:21-cv-
    00640-DAD-DMC, 2025 U.S. Dist. LEXIS 61676, at *17 (E.D. Cal. Mar. 31, 2025).

**Resp. in Opp'n to Mot. for Stay**                    5

1   2024) and *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2024 WL

2   1286936, at *3–4 (N.D. Cal. Mar. 25, 2024). Although this Court observed that these cases are

3   "distinguishable because the court found no significant change in law," D. 135, 20 n.6, PPMM

4   contends that "the decision's *outcome* did not alter the standards applied in determining whether

5   to grant Rule 60(b)(5) relief," D. 137, 14. But that confuses "appli[cation]" of a given standard

6   with a court's determination that a party's basic premise is incorrect and resolution of the matter

7   on that simpler ground. The *PPFA* court did the latter: because it found that there was no change

8   in law, 704 F. Supp. 3d at 1039, it did not engage in the type of protracted analysis that could

9   possibly show that there is some lingering question, serious or otherwise, concerning the

10   applicable standard in this case.[4] The related *National Abortion Federation* case did the same.

11   No. 15-cv-03522-WHO, 2024 U.S. Dist. LEXIS 53157, at *12–13 (N.D. Cal. Mar. 25, 2024); *id.*

12   at 10–11 (quoting the same portion of *Rousseau* discussed *supra* n.4). Accordingly, PPMM's

13   argument under these cases fails to show the existence of any serious questions.

14   **B. PPMM concedes there is no serious question and misstates this Court's holding.**

15        Second, PPMM's claim that there are questions about "whether courts are barred from

16   considering independent legal grounds" amounts, at most, to an assertion that it can demonstrate

17   that the district court had *discretion* to consider "independent legal grounds," not that it was

18   required to do so. *See id.* at 14. Even assuming *arguendo* that this is correct, it does not help

19   PPMM: the premise that the choice to consider such grounds is within a district court's discretion

20   leads to the conclusion that, had this Court declined to do so, that would have been a proper

21

22       [4]Nor did the *PPFA* court ever suggest that analysis of equitable factors or anything else
might be appropriate in a case in which the sole legal basis for an injunction had evaporated. To
the contrary, it recognized *Rousseau*'s guidance that "[i]f the moving party cites significantly

23   changed *circumstances*"—*not* law—then other factors should be considered." *Id.* at 1035; *see
supra* n.2.

1  exercise of its discretion.[5] So this ultimately serves as a concession of the absence of serious

2  questions in this case.

3      PPMM also argues that "*Becerra* leaves open the question of whether . . . courts are

4  required . . . to assess independent legal grounds to avert *Rufo*'s warning in determining whether

5  a modification is suitably tailored to changed circumstances." *Id.* at 13. While this argument is

6  ultimately irrelevant, since the Court *did* consider PPMM's arguments under various additional

7  constitutional grounds, *infra* pp. 8–9, it is also incorrect. Again, as the Court noted in its Order,

8  *Becerra* was "clear": "it is an abuse of discretion to deny a modification of an injunction after *the*

9  *law underlying the order* changes to permit what was previously forbidden." D. 135, 19 (quoting

10  978 F.3d at 713–15) (emphasis added). The question, therefore, is about the *actual* basis of the

11  order, *not* whether some other legal basis might exist for it. District Attorneys provided further

12  explication of this fact in their Second Supplemental Brief, giving numerous examples of the

13  language in *Becerra* making it clear that the question is about the law forming the basis of the

14  injunction, rather than *any* law that might support the injunction. D. 133, 6–7 (quoting 978 F.3d

15  at 713–17) (quoting 12 such examples).

16      Beyond the fact that this requirement is clear in *Becerra* (as well as *Agostini* and numerous

17  other cases), it is plain that a party cannot simply adduce a new legal theory any time a previously

18  successful theory is rendered null. That is simply a basic part of the way courts operate.

19  Litigation cannot advance without a "case or controversy." U.S. Const. art. III, § 2. And a "case

20  or controversy" does not manifest by a party simply claiming that an injunction based on *one*

21  legal theory might just as well have been based on another. This Court found that *Roe*, which is

22  now gone, was the sole legal basis for the injunction at issue, D. 135, 25, a conclusion that

23  ─────────────────

[5]However, as discussed below, *infra* pp. 8–9, this Court *did* consider such grounds to the limited extent PPMM has developed them.

1    PPMM does not dispute, *see generally* D. 137. Accordingly, even if *Becerra* and *Agostini*'s clear

2    instruction did not exist, there would still be no basis to maintain an injunction that *actually was*

3    based solely on *Roe*, as the injunction at bar was.

4        Finally, the simple fact is that PPMM's argument here does not even have a *factual* basis.

5    PPMM states, "[T]he Court decided that whether independent constitutional grounds should be

6    considered in determining whether to lift the injunction was not properly before it[.]" *Id.* at 4

7    (citing D. 135, 24–26). That is not correct, as it oversimplifies the Court's decision. The Court

8    did not hold that the question of *whether* such grounds should be considered was not properly

9    before it, but held only that PPMM had not developed its arguments *on* those grounds in a

10   manner sufficient to support a permanent injunction. D. 135, 26.[6] Indeed, the Court *did* consider

11   the alternative grounds argued by PPMM, to the minor extent such arguments were made. *Id.* at

12   25–26. Thus, rather than finding that the question of whether to consider them was not before it,

13   the Court explicitly found that "[a] permanent injunction is only warranted when a party has

14   succeeded on the merits of their claim, and *none of Plaintiff's alternative grounds have been*

15   *litigated on the merits*." *Id.* at 26 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394–96

16   (1981)) (emphasis added). Critically, the Court also held, "If Plaintiff can show that it is entitled

17   to a preliminary injunction on an alternative basis, the Court should issue a preliminary

18   injunction on this basis at the same time as it lifts the permanent injunction on the now-overruled

19   basis," but noted that PPMM "has not moved for a preliminary injunction, [so] the record before

---

20        [6]Accordingly, the Court accurately stated, "whether the statute is unconstitutional for

21   another reason" was not "properly before the Court *in this motion*." *Id.* at 24. (Notably, it
     appears, in light of the fact that the Court actually *did* consider whether "these grounds

22   have . . . been litigated" sufficiently, *id.* at 25, that the foregoing statement is best understood to
     be focused on the alleged "reason[s]" themselves—i.e., the question whether the alleged

23   "reason[s] *themselves* might suffice to enjoin the parental-notice regime was not properly before
     the Court. *See id.* at 24.

1    the Court does not support such relief." *Id.* PPMM's inaccurate characterization of the Court as

2    declining to consider alternative grounds cannot save it from its burden of properly presenting

3    those grounds in an appropriate motion.

4         In short, there is no question, serious or otherwise, about whether the Court should have

5    considered alternative *constitutional* grounds: it did do so and determined that PPMM's

6    arguments had not been developed sufficiently to maintain a permanent injunction based thereon.

7                    **II. PPMM fails to show that it will be irreparably harmed.**

8         Because PPMM has failed to show, at a minimum, serious questions going into the merits,

9    and thus has not satisfied the initial hurdle for a stay pending appeal, this Court need not analyze

10   whether it has shown irreparable harm. However, should the Court consider that factor, it should

11   conclude that PPMM has not shown that it will suffer irreparable harm absent a stay.

12   **A. Mere possibility and speculation do not establish irreparable harm.**

13        In the irreparable harm analysis, a party is not entitled to a presumption of irreparable harm,

14   and a showing of a mere *possibility* of irreparable harm is not enough—a *likelihood* of

15   irreparable harm is what is required, at a minimum. *E. Bay Sanctuary Covenant v. Trump*, 932

16   F.3d 742, 778 (9th Cir. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Relatedly, the

17   movant "cannot meet this burden by submitting conclusory factual assertions and speculative

18   arguments that are unsupported in the record." *Doe v. Trump*, 957 F.3d 1050, 1059–60 (9th Cir.

19   2020).

20   **B. PPMM's premise is foreclosed by precedent.**

21        The premise for PPMM's argument that it will be irreparably harmed absent a stay is that the

22   parental-notice law is ambiguous such that providers will be "vulnerable to arbitrary" criminal

23   enforcement, being "unable to demonstrate compliance" with its requirements, while abortion-

1   seekers subject to the law will be subject to "delayed access to care or a *de facto* ban." D. 137,

2   14–16. Although it provides various examples of the harms it claims will *result* from this root

3   harm, those examples are all based in the idea that the statute is too vague. *Id.* at 16–18 (alleging

4   harm will flow to abortion-seekers as a result of being "unable to demonstrate compliance"), 19

5   (alleging same as a result of "unclear and currently indiscernible bypass process"), 19–22

6   (alleging harm will flow to "PPMM, its providers, and staff" as a result of having to "divin[e]

7   how to demonstrate compliance with vague and opaque," "ambiguous statutory requirements").

8   Accordingly, the foremost question is whether the parental-notice law can, in fact, properly be

9   considered vague.

10       Concerning that question, the most noteworthy thing is the fact that PPMM does little to

11   explain *how* it is vague or why precedential cases *rejecting* identical vagueness arguments should

12   not be heeded here. While it alleges that the process for notifying a parent is not specific enough,

13   *id.* at 14 (citing Decl. of Laura Dalton, D.O. ("**Dalton Decl.**"), D. 139-1, ¶¶ 30–33, 37), the few

14   examples it gives strain credulity. For example, the declaration cited by PPMM claims that even

15   if an abortion-seeker "attends their appointment with their parent," a law enforcement officer

16   might still believe the parent has not been notified. D. 139-1, ¶ 31. Beyond the highly speculative

17   presumption that a parent would not simply advise the officer that the parent had been notified,

18   medical practitioners frequently rely on signatures. From payment authorization forms to HIPAA

19   acknowledgments to medical releases, patient or legal guardian signing is not some mysterious

20   new endeavor in the medical field. A provider concerned about demonstrating notification could

21   easily use the same sort of evidence used every day in the field, the signature. And should any

22   concern remain, the legal regime itself provides a means of notification that would serve as

23   evidence of notification: certified mail. NRS 442.255(1). PPMM does not explain why such

1    mailing would be inadequate to address its concerns.[7] In sum, beyond the speculative nature of

2    this concern, the law itself provides an answer to it.

3        Nor can there be any question of the fact that that is sufficient. The Supreme Court has

4    already upheld a strikingly similar legal regime. Describing Ohio's parental-notice law, the Court

5    said:

6        [A] physician may perform an abortion if he provides 'at least twenty-four hours actual
         notice, in person or by telephone,' to one of the woman's parents (or her guardian or
7        custodian) of his intention to perform the abortion. . . . If the physician cannot give the
         notice 'after a reasonable effort,' he may perform the abortion after 'at least forty-eight
8        hours constructive notice' by both ordinary and certified mail. . . .

9    *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 507 (1990) ("***Akron II***"). The Court upheld

10   this provision, citing no concerns of harm arising from its apparent lack of a description of how

11   such notice should be evinced, what "reasonable" meant, or constructive notice options other

12   than mail. *See id.* at 518–19. Indeed, the Court found that "[a]ny imposition on a physician's

13   schedule" arising from the notice requirement, far from being *exacerbated* by the "reasonable

14   effort" and mail provisions, were ameliorated thereby, and by the legal regime's exception in the

15   case of emergencies, *id.* at 519, another aspect that the law at issue here shares, NRS 442.255(1)

16   (creating exception for when "in the judgment of the attending physician an abortion is

17   immediately necessary to preserve the patient's life or health"). This Court should not diverge

18   from the Supreme Court's determination concerning this near-identical provision.

19       PPMM also argues that the "pocket approval" (or "constructive authorization") provision of

20   the judicial bypass procedure is too vague, also "leav[ing] providers unable to demonstrate

21       [7]PPMM does, in its "Relevant Facts" section—but not its argument—note that "last
22   known address," used in NRS 442.255(1), is not defined. PPMM does not explicitly state that
     this is an ambiguous term, but if it intends to imply that it is, it offers no explanation of how this
23   self-explanatory term is ambiguous and thus waives such argument. *Graves v. Arpaio*, 623 F.3d
     1043, 1048 (9th Cir. 2010) (per curiam) ("arguments raised for the first time in a reply brief are
     waived").

1    compliance." D. 137, 14 (citing D. 131, 9–11; Dalton Decl. ¶¶ 32–33). District Attorneys have

2    already addressed this contention. Second Suppl. Br., D. 133, 19–20 (citing *Glick v. McKay*, 937

3    F.2d 434, 437 n.3 (9th Cir. 1991); *Lambert v. Wicklund*, 520 U.S. 292, 295, 300 (1997)). As

4    District Attorneys explained, the Ninth Circuit has already addressed that concern in this very

5    case. While the 1985 *Glick* decision held that the "provision for a 'pocket approval' puts the

6    physician in a difficult position" because "the physician has nothing tangible to rely upon to

7    prove compliance with the law," *Glick v. McKay*, 616 F. Supp. 322, 325 (D. Nev. 1985), the

8    Ninth Circuit rejected that determination because the Supreme Court had, in *Akron II*, upheld just

9    "such a provision," 937 F.2d 434, 437 n.3 (9th Cir. 1991) (citing *Akron II*, 497 U.S. at 515, 110

10   S. Ct. 2972, 2981). And regardless of the Ninth Circuit's determination, a later decision of the

11   Supreme Court held that a "judicial bypass provision . . . [that] was substantively

12   indistinguishable from . . . the Nevada provision at issue in *Glick*" "satisfied any criteria that

13   might be required for bypass provisions in parental notification statutes." *Lambert*, 520 U.S. at

14   295. Thus, PPMM is precluded from once more arguing, in the very case in which a higher court

15   has rejected the argument—an argument also precluded in a different case by the Supreme

16   Court—that the lack of a tangible order for the physician to rely upon renders these provisions

17   harmfully ambiguous.

18        Similarly, PPMM's arguments concerning the procedural requirements of the judicial bypass

19   procedure are also largely precluded. For example, PPMM alleges that the law "does not

20   adequately describe the process that a patient seeking a judicial bypass order must follow." D.

21   137, 15 (citing *Glick*, 616 F. Supp. at 325 n.2). But, again, the Ninth Circuit has already rejected

22   the "argu[ment] that the statute is constitutionally deficient because it fails to set forth a specific

23   procedure for a minor to arrange a judicial interview," noting that "[s]uch a specific procedure is

**Resp. in Opp'n to Mot. for Stay**              12

1   not constitutionally required" and holding that the judicial "bypass procedure provides" the

2   constitutionally-required "opportunity to a minor, both at the judicial interview and at the petition

3   hearing." 937 F.2d at 437 n.2 (citing NRS 442.255(2), 442.2555(3)). PPMM also cites its Second

4   Supplemental Brief, D. 131, 8–9. *See* D. 137, 15. Beyond that brief's contention concerning the

5   initiation of the bypass procedure, just addressed, its primary argument is that a lack of specifics

6   concerning "how the statute will be administered" raises "procedural due process" concerns. D.

7   131, 8. But District Attorneys have, based on the Ninth Circuit *Glick* decision and *Akron II*,

8   already refuted the contention that these issues might create a deprivation of due process, *see*

9   Second Suppl. Br., D. 133, 20–22 (quoting, *e.g.*, *Akron II*, 497 U.S. at 517–18, concerning a

10  parental notice regime like the one at issue here: "[the] confidentiality provisions, the expedited

11  procedures, and the pleading form requirements, on their face, satisfy the dictates of minimal due

12  process," "little risk of erroneous deprivation under these provisions and no need to require

13  additional procedural safeguards"). Similarly, District Attorneys have refuted the notion that

14  confidentiality problems will likely arise from the law. *Id.* at 21–22; *contra* D. 131, 8. Finally,

15  while PPMM raises concerns about administering the compensation of appointed counsel, D.

16  137, 15, it does not explain how ambiguity concerning such administration might harm PPMM or

17  its patients, and therefore waives any such argument. *Graves*, 623 F.3d at 1048.

18      Finally, as District Attorneys have explained in their Second Supplemental Brief, D. 133,

19  21–22, the *Akron II* Court, considering a judicial bypass provision that "was substantively

20  indistinguishable from . . . the Nevada provision at issue" here, *Lambert*, 520 U.S. at 295, ruled

21  that it "satisf[ied] the dictates of minimal due process," presenting "little risk of erroneous

22  deprivation under these provisions and no need to require additional procedural safeguards." 497

23  U.S. at 517–18; *see also* Second Suppl. Br., D. 133, 22 n.10 (noting that under *Akron II*, the fact

**Resp. in Opp'n to Mot. for Stay**          13

1    that "initial confusion" may arise does not give rise to arbitrary enforcement concerns). This

2    Court should not find that the very procedures *approved* in *Akron II* are somehow so wanting

3    here that it is likely that they will cause non-speculative, irreparable harm. It certainly should not

4    find that such harm is highly likely, the showing PPMM must make in light of its poor showing

5    regarding the merits.

6        Because PPMM fails to show that the parental-notice regime contains the ambiguities it

7    alleges, there is no likelihood that any harm will *follow* from those (non-existent) ambiguities.

8    "[S]imply showing some possibility of irreparable injury fails to satisfy th[is] [] factor." *Nken*,

9    556 U.S. at 420. Accordingly, PPMM cannot satisfy the irreparable harm factor. Finally, even if

10   the Court did find ambiguity of the sort PPMM claims and thus consider the harms it alleges to

11   result, it should note the way in which PPMM's particular claim of harm overlaps with the merits

12   analysis. PPMM's claims of ambiguity and arbitrary enforcement are, at base, claims against the

13   merits of the parental-notice regime: arbitrary enforcement arising from ambiguity is a classic

14   due process claim. It is therefore appropriate for this Court to consider Justice Stevens' *Akron II*

15   concurrence. Justice Stevens, in an analysis rooted in constitutional concerns, recognized the

16   *potential* harms that could arise from notifying parents of an abortion decision but, after noting

17   the existence of the bypass procedure provided by the law at issue, essentially found the

18   possibility of such harm too speculative: "The question in this case is whether that statutory

19   protection for the exceptional case is so obviously inadequate that the entire statute should be

20   invalidated. I am not willing to reach that conclusion before the statute has been implemented

21   and the significance of its restrictions evaluated in the light of its administration." 497 U.S. at

22   521 (Stevens, J., concurring in part and concurring in the judgment). This statement, concerning

23   a statutory scheme "substantively indistinguishable from" the one at bar, *Lambert*, 520 U.S. at

**Resp. in Opp'n to Mot. for Stay**        14

295, speaks to both the merits and the potential harm alleged, further demonstrating the frailty of PPMM's claims on both fronts.

For all of these reasons, this Court should find that PPMM has not demonstrated any likelihood of irreparable harm.

### III. The balance of the equities and the public interest factor disfavor a stay.

Because PPMM can show neither likely merits success (or even serious questions going into the merits) nor likely irreparable harm absent a stay, the Court need not reach the remaining analytic factors—"whether the balance of equities tips in the plaintiff's favor; and [] whether an injunction is in the public interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies*, 632 F.3d at 1131–32.[8] However, should it consider these factors, it should find that they favor District Attorneys.

"[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury")). Because the last two factors merge, another way of saying this is that giving effect to "the will of the people" by permitting enforcement of the laws they and their representatives enact serves the public interest—thus, "the public interest necessarily weighs against enjoining a duly enacted statute." *Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021). This Court has found that "Nevada's parental notification and judicial bypass scheme survive rational basis review," D.

---

[8]Because state officials are parties, these factors merge. *See Nken*, 556 U.S. at 435.

135, 24, so it is in the public interest for them to be enforced, and District Attorneys and Nevada would be irreparably harmed by any further delay in their enforcement.

The parental-notice regime also serves the public interest in numerous specific ways. This Court recognized both (**1**) that the law is guided by the "minor's best interest" and (**2**) the legitimacy of the specific interests served by the law—namely, "encouraging parental involvement in the decision to have an abortion, and . . . protecting immature minors and promoting family integrity." *Id.* at 22 (citing D. 10, 5–6). This Court also noted that these "were recognized as legitimate even under *Roe*" and noted other Supreme Court cases emphasizing the "special" and "important" interests that parental notice laws serve. *Id.* (citing *City of Akron v. Akron Center for Reprod. Health, Inc.*, 462 U.S. 416, 427 n.10, 443 n.32 (1983), *overruled on other grounds by Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833 (1992); *H. L. v. Matheson*, 450 U.S. 398, 411 (1981)). Following *Dobbs*, these interests are even stronger, as there can be no fear that they may risk interference with a constitutional right. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) ("The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision[.]").

PPMM offers no meaningful argument to the contrary. The most it can say is that District Attorneys' arguments concerning harm in this case have been "speculative and conclusory," but, in an ironic twist, this statement itself is purely conclusory, as PPMM offers no citation to the record and offers not a single example to evince its contention. D. 137, 22. PPMM leans heavily on the fact that enforcement of the parental-notice regime has been enjoined for "nearly four decades," *id.* at 22–23, without addressing the fact that obviously looms over this argument and this whole case: that injunction was based solely on case law that has now been overruled and is thus, at this very moment, unconstitutional. So the opposite conclusion follows from PPMM's

1    "four decades" observation: Nevada has been restricted for far too long from enforcing its duly-

2    enacted laws, which have been vindicated, finally, by *Dobbs*. Every day that is added to these

3    near-forty years adds further irreparable harm to Nevada, in contravention of the public interest.

4        PPMM's claims relating to state law also fail. Indeed, PPMM has already conceded that

5    "this Court cannot order Nevada state actors to comply with Nevada law." D. 131, 6 n.3 (citing

6    *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Yet, although this Court

7    agreed, D. 135, 25 n.9 (citing same) (declining to consider state law arguments because "a federal

8    court cannot enjoin a state actor based on state law"), PPMM attempts to sneak state law claims

9    through the back door of the public interest analysis. It claims that because Nevada's constitution

10   guarantees nondiscrimination, including on the basis of age and sex, the parental-notice regime

11   would harm the public interest. D. 137, 23–24; *see also id.* at 24 (citing "subsequent legislative

12   and electoral actions to protect and expand access to abortion care"). This Court should continue

13   to refrain from continuing the injunction "based on state law." D. 135, 25 n.9. District Attorneys

14   note only the soundness of this principle here. The Nevada Supreme Court has "recognized that

15   states have the power to make adjustments in the constitutional rights of minors," even rights that

16   form "the cornerstone of the family and our civilization." *Kirkpatrick v. Eighth Judicial Dist.*

17   *Court*, 119 Nev. 66, 72, 64 P.3d 1056, 1060 (2003). Accordingly, the Nevada Supreme Court has

18   declined to strike down "reasonable limitations" on such rights "under either the United States or

19   Nevada Constitutions." *Id.* at 70, 77. Moreover, the United States Supreme Court has explicitly

20   held that it is "establish[ed] conclusively that" "the disfavoring of abortion" "is not *ipso facto* sex

21   discrimination." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273 (1993) (citing

22   *Maher v. Roe*, 432 U.S. 464 (1977); *Harris v. McRae*, 448 U.S. 297 (1980)). The parental-notice

23   regime represents not disfavor for abortion, but simply a desire to protect minors, so it is even

**Resp. in Opp'n to Mot. for Stay**            17

1   further removed from sex discrimination. Accordingly, there are ample reasons for this Court to

2   continue to decline to seek to determine how the Nevada Supreme Court might analyze PPMM's

3   claims.

4       In sum, because this Court has concluded that the legal basis for the injunction is gone, it is

5   plain that Nevada would be irreparably harmed by continuing to be enjoined from enforcing its

6   laws, to the detriment of the many public interests those laws serve. PPMM offers no meaningful

7   argument to the contrary. Accordingly, the merged irreparable harm and public interest factors

8   strongly favor District Attorneys.

9                           **IV. An administrative stay is not warranted.**

10      An administrative stay is not warranted in this case. *Contra* D. 137, 24–25. "That such stays

11  are 'administrative' does not mean they are value neutral. Their point is to minimize harm while

12  an appellate court deliberates, so the choice to issue an administrative stay reflects a first-blush

13  judgment about the relative consequences of staying the . . . judgment[.]" *United States v. Texas*,

14  144 S. Ct. 797, 798 (2024) (Barrett, J., joined by Kavanaugh, J., concurring). In this case, as

15  explained above, the plain, abundant, and irreparable harm that would follow from continuing the

16  constitutionally-baseless injunction for any longer, after it has already been in place for nearly

17  forty years, is clear. *Supra* Part III. Because it is *also* clear that PPMM has presented no

18  meaningful argument that there is even a serious question here, *supra* Part I, this Court need not

19  engage in the sort of lengthy, extended analysis that warrants a stay of any sort. *See Texas*, 144 S.

20  Ct. at 799 (Barrett, J., joined by Kavanaugh, J., concurring) (noting that it is permissible for

21  judges to cite the underlying merits in deciding whether to grant administrative stay: "Because an

22  administrative stay precedes a ruling on a stay pending appeal, the *Nken* factors are obviously on

23

**Resp. in Opp'n to Mot. for Stay**          18

1    the court's radar, and unsurprisingly, they can influence the stopgap decision, even if they do not

2    control it.").

3         There is another reason to deny an administrative stay. As PPMM notes, a key purpose of

4    administrative stays is to preserve the status quo. D. 137, 24. However, in cases concerning

5    essential public interests, the status quo is the preservation of those interests. In *United States v.*

6    *El-O-Pathic Pharmacy*, 192 F.2d 62 (9th Cir. 1951), a case that, like the present case, concerned

7    "the protection of the public[,]" *id.* at 79 n.12, the Ninth Circuit found that such a "broad public

8    interest" is sufficient to "form[] the basis of the status quo that must be preserved." *Apple, Inc. v.*

9    *Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 78102, at *16–17 (N.D.

10   Cal. June 4, 2012) (citing 192 F.2d at 79 n.12). As explained above, it is clear that the public

11   interest requires that the injunction be lifted immediately.

12        But even if "status quo" were not defined by protecting the public interest, this Court would

13   still be correct to conclude that the "status quo [i]s the state of affairs *prior to judicial*

14   *intervention*," as the Ninth Circuit has defined it. *Texas*, 144 S. Ct. at 798 n.2 (Barrett, J., joined

15   by Kavanaugh, J., concurring) (citing *Golden Gate Rest. Ass'n v. City of S.F.*, 512 F.3d 1112,

16   1116–17 (9th Cir. 2008)) (emphasis added). In *Golden Gate*, the Ninth Circuit found that

17   *permitting an ordinance to go into effect* by staying the district court's injunction "would, in a

18   real sense, preserve rather than change the status quo," noting that absent the injunction, "the

19   provisions . . . would now be part of the status quo." 512 F.3d at 1116. In this case, despite the

20   lengthy passage of time since the injunction issued, it remains true that the state of affairs before

21   judicial intervention—i.e., the issuance of the injunction—was for the parental-notice regime to

22   go into effect. Accordingly, the "status quo" purpose of an administrative stay counsels that such

23   a stay is inappropriate here.

**Resp. in Opp'n to Mot. for Stay**         19

1    Beyond these considerations, several additional factors show that such a stay is neither

2    necessary nor proper. First, as discussed above, it is abundantly plain that PPMM has failed to

3    satisfy the criteria for a stay pending appeal, including the first factor of serious questions going

4    into the merits, such that extended review and analysis is not needed—indeed, this Court may

5    properly end its analysis after consideration of the first factor alone. *Supra* Part I. Second, this

6    Court will need little time to review PPMM's arguments because it is already familiar with them;

7    PPMM explicitly notes that the issues raised in PPMM's Stay Motion "overlap significantly with

8    the issues addressed in this Court's Rule 60(b) Order," D. 137, 2 n.1. Third, despite the minimal

9    amount of time the Court will need to consider the Stay Motion, it will nonetheless have four

10    days (five, including April 25 itself, given the 9:00 a.m. PST due date for PPMM's reply) after

11    the April 25, 2025 due date for PPMM to file its reply brief, D. 140, in which to consider the

12    motion, before the court's order lifting the injunction is scheduled to go into effect on April 30,

13    2025. Fourth, it is clear that irreparable harm will befall Nevada, to the detriment of its public

14    interest, every day Nevada's valid parental-notice regime cannot be enforced. *Supra* Part III.

15    Accordingly, this Court should not enter an administrative stay.

16                                **V. Conclusion.**

17    For all of the foregoing reasons, this Court should deny both PPMM's request for a stay

18    pending appeal and its alternative request for an administrative stay.

19

20

21

22

23

1    Dated: April 21, 2025                    Respectfully submitted,

2                                             Emily C. Mimnaugh (NV Bar #15287)
                                              PACIFIC JUSTICE INSTITUTE, Nevada Office
3                                             1580 Grand Point Way #33171
                                              Reno, NV 89533
4                                             Telephone: (916) 857-6900
                                              Fax: (916) 857-6902
5                                             emimnaugh@pji.org

6                                             *Designated Resident Nevada Counsel for
                                              Defendants Pruyt and Rye*

7                                             /s/ James Bopp, Jr.
                                              _____
8                                             James Bopp, Jr. (IN Bar #2838-84)*
                                                   jboppjr@aol.com
9                                             Richard E. Coleson (IN Bar #11527-70)*
                                                   rcoleson@bopplaw.com
10                                            Joseph D. Maughon (VA Bar #87799)*
                                                   jmaughon@bopplaw.com
11                                            THE BOPP LAW FIRM, PC
                                              The National Building
12                                            1 South Sixth St.
                                              Terre Haute, IN 47807-3510
13                                            Telephone: (812) 232-2434
                                              *Admitted pro hac vice.

14                                            *Counsel for Defendants Pruyt and Rye*

15

16

17

18

19

20

21

22

23

**Resp. in Opp'n to Mot. for Stay**              21

1

## Certificate of Service

2

I hereby certify that on this 21st day of April, 2025, a true and correct copy of this Response

3

in Opposition to Motion for Stay of District Court Decision was served via the United States

4

District Court CM/ECF system on all parties or persons requiring notice.

5

6

7

8

9

10

By /s/ James Bopp, Jr.
James Bopp, Jr. (IN Bar #2838-84)*
jboppjr@aol.com
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
*Admitted pro hac vice.

*Counsel for Defendants Pruyt and Rye*

11

12

13

14

15

16

17

18

19

20

21

22

23

**Resp. in Opp'n to Mot. for Stay**          22